Thank you, Your Honor. Good morning. May it please the Court, Phil Talmadge and Robert Rauch here representing Bioenergy of Washington and INGENCO. And I'd ask, Your Honor, if I could reserve five minutes of rebuttal time. Of course. ACE provided property insurance coverage in 2010-2011 to Bioenergy of Washington in connection with its Cedar Hills facility in Maple Valley, Washington, a facility that processed landfill gases into renewable natural gas, methane, that was then sold to Puget Energy. It was a very good situation, a green situation, that was being accommodated by this facility. For that coverage, Bioenergy of Washington paid $221,000 in annual premiums, 60% of which was allocated to the Cedar Hills facility. The District Court here erred in preemptorily resolving multiple questions of fact regarding the general property loss provisions in the policy, as well as the boiler and machinery endorsement in the policy. We ask that the Court reverse the District Court's decision in that regard. Now I'm going to focus this morning on those issues, the issue of the general insurance, property insurance, and the boiler and machinery endorsement, and leave to the briefs the other issues that we have raised with respect to FRCP 37 and some of the other issues in the case, unless the Court has specific questions regarding any of those issues. Let me speak first, I guess, to Washington law regarding the interpretation of insurance policies. Washington law governs here, and Washington applies a very pro-insured set of interpretive standards with respect to insurance contracts. In this case, the District Court misapplied many of those favorable interpretive principles that are associated with the interpretation of insurance policies in Washington. Let's start first with the all-risk exclusion, looking first at the insuring clause. ACE covered all risks of loss or damage from an external source. The term external source is undefined in the policy, but the District Court here concluded erroneously that the entire nitrogen rejection unit, the entirety of the system was a single unitary system as opposed to something that was made up of discrete components. Counsel, why should we apply any meaning other than the plain meaning of external cause? You shouldn't, Your Honor. You should do it, you should apply the plain meaning from the perspective of the average purchaser of insurance, which is the standard in Washington. And when you have an undefined term like this, you use its popular, ordinary, regular meaning. So what do we mean by an external source here? In Dixon, the key case on which we rely from the Washington State Supreme Court, you had a circumstance where a crane broke down. There was a defect in a well, but the crane broke down as it was attempting to pull an H-beam out of the earth, and the earth had fallen, making that process more difficult for the crane to accomplish. That was an external source. That's the key case on external sources. Contrast that with a circumstance like a Y2K problem in the Port of Seattle case where it is internal to the system. Here, it's absolutely undisputed in this case that King County has a contract with Bioenergy of Washington. King County has the ability to completely cut off the landfill gas going to the system. They can do that at any time, at any point that they choose to do so. That's at excerpts of record 428, 429. If that's the case, from the plain, ordinary, common understanding of the term, how can the gas be something internal to the system if someone else can cut it off? Well, can I ask you this? There's always a risk of trying to oversimplify things, and so tell me if I've done that. Are we really just called upon to figure out whether the thing that caused the loss here was really just an internally defective component of the system, namely that, what is that basket thing called? The diffuser basket. The diffuser basket, thank you. Because I think you would concede that if in fact that basket had been defectively manufactured, and that's what caused the failure and led to all the problems, I assume then you would say that no, there would not be an external cause for the loss. Is that right? No, I don't think we'd say that at all, Your Honor, because we have to start first with the insuring clause. In Washington, it's a two-step process. Look to the insuring clause. That defect is an exclusion. Look to the exclusion. They argue, Ace argues, it's not an external cause because it's all part of a single system. As I've mentioned, King County could cut off this so-called internal cause to the problem, but more to the point, why in the world would Bioenergy of Washington and Ingenco buy this coverage, knowing the nature of this system, if gas coming into the system was always excluded? It would render illusory the coverage. There's a facetious statement in Justice Neal's opinion. Can I just interrupt? You cite, both sides cite, standard structural steel as an important case, right? Yes. And that case debunks, to a large extent, the formalistic view of, even under plain meaning, of what external source means. Because if you take it literally, it means unless a lightning bolt hits the system or a plane falls out of the sky, there's no coverage. So the courts start to look at external causes as a, as the case says, a sort of partnership with fortuitousness. Correct. And to me, when you go down the path of trying to create this sort of artificial construct of externality based upon where the gas comes from, where the air comes from, where the steel comes from, you go down a path that, to me, doesn't make any sense. And, you know, maybe it's just dealing with the sort of tension between the art of an insurance policy and reading it in plain meaning, but you're really there when you get an all-risk policy to ensure everything except things that, for reasons of public policy and other specific reasons, should not be covered. Inherent defects, wear and tear, those sorts of things. But if you limit it to just externality, the only thing you bought was coverage against a meteor strike. Am I right? I think you're right. The problem we have is that the district court didn't agree with you, Your Honor. The district court saw this and applied literally this notion of external cost to say, well, you know, the gas is internal to the system. It's not. It's an outside input. It's an external source to the system. We have a burden of overcoming, first of all, that the insuring clause applies. We would agree with you that, you know, you look at an all-risk policy as all risk minus specific exclusions that are there for public policy reasons and we can get to the exclusions in a minute. But we overcome that external source problem that the district court identified because this was an external source. The gas came from someone else. It was under the control of someone else. It was an external source of harm. And it was, in effect, in this particular set of circumstances, like a sledgehammer hitting the system, causing the system to fail. Now if we get to the exclusions, as the court is talking about, you have questions of fact that abound. I mean, quite frankly, this is a battle of experts. You have our experts, OCE, that say it's sudden, unexpected, it's a major disaster that happened. You have their experts that disagree. Now one of their experts didn't understand that the media was not in the basket. The media is in the whole vessel, this 20-foot tall device that does the purification process. But be that as it may, it was a distinct difference between the experts on this question of whether these exclusions apply, wear and tear, you know, the defect in the system, all of that. All of that, they were up for grabs. They were distinct differences between the experts on those points. Well, Counsel, maybe you can help me out here. It seemed to me you inconsistently referred to both, quotes, the flow-induced vibrations and, quote, the process gas as the cause of evangelicals' losses. Which is it and why? The process gas is the efficient proximate cause of the loss. It caused the vibration in this unique set of circumstances in such a fashion as the basket failed. That's the set of circumstances we're talking about. But it was the influx of this high-velocity landfill gas that was the efficient proximate cause. And it's an important point when we get to the additional question on these exclusions of the ensuing loss provision. They argue, they try to argue that the basket itself was the cause of the problem. The gas was the cause of the problem. It's an external source. Even if there was wear and tear or defect or what have you, under the ensuing loss provision, as the Washington Supreme Court has interpreted that concept in Vision 1, there's an exception to the exclusion and coverage applies because the initial precipitating event, the influx of this high-velocity gas, was the reason the system had the failure. I thought your theory was that the gas created harmonics, which led to a breakdown in the harmonics because every system has to be engineered a little differently. Even when you have engineering specs that you design a system in relation to that you can't anticipate every possible thing that might happen and that's why you get insurance. Correct. That's exactly right, Your Honor. It's the way the gas came in. It caused the vibration that it caused. Their expert, Dr. Casey, recognized that vibrations of the sort of resonance of the sort we're talking about could be a cause of the harm. And the conclusion of our experts was that it was, in fact, this event that caused it. It's a question of fact for the trier effect, not something resolved as a matter of law. That's why I guess I don't understand then why if there was some inherent manufacturing defect in the basket and that caused the thing to fail. I don't understand why you think then there would be coverage as an external cause. Because all of the experts, Your Honor, said the basket wasn't defective. It couldn't handle the circumstances under which it... Just hang on. I asked you a hypothetical question in which the cause of the basket's failure was an inherent manufacturing defect. It had nothing to do with anything you guys did wrong. It was just whoever you bought the thing from, they just didn't manufacture it properly. I was asking, in that scenario, are you still arguing that you have coverage? That's all I was trying to figure out. And you said, oh, yeah, no, even in that scenario, we would have coverage. And that seems to me inconsistent with the dialogue you just had with my colleague. You'd have coverage under the ensuing loss provision, Your Honor, and that's the exception to the exclusion. As the ensuing loss provision has been understood in Washington law, it is an exception to the exclusion for things like wear and tear and defects. Loss doesn't occur on the date that the diffuser basket fails. It's much later, and it's actually due to other issues that occurred with the operation of the system, right? So it's not like there was some... That's why I don't think you're saved by the ensuing loss provision. That's why I've been focusing mainly on the ensuring clause. So again, just forget about the ensuing loss provision. You're still saying that you would deem the gas to be an external cause of the loss, even if the thing that caused the diffuser basket to fail was an inherent manufacturing defect? Well, it would be the efficient proximate cause under Washington law. Washington law recognizes this concept of efficient proximate cause. I'm not talking about tort concepts. We're talking about external causes defined in the policy, right? Well, it's not a tort concept in Washington law, Your Honor. It's a factor that's looked upon for insurance purposes. The efficient proximate cause is the basis for coverage here, and the efficient proximate cause is the influx of the high-velocity gas. Notwithstanding the fact that there's wear and tear, notwithstanding whether there's defect there, that's exactly what the principle of ensuing loss provides for, that you can have the precipitating cause, you can have these other factors that might not be covered, but if the initial precipitating cause results in coverage under the ensuing loss provision, you get coverage. My point here is this. The ensuring clause, question of fact, is the coverage, is it from an external source? We say absolutely so. Is there a preclusion under the exclusions to the policy? No. Question of fact there, according to all the experts. Is there coverage as a matter of law, or no coverage as a matter of law? It's a question of fact under Washington law, this whole train of causation. We get coverage under the ensuing loss provision, therefore we prevail under those circumstances as well. The trial court jumped the gun here in resolving the issues that are factually intense as a matter of law. Let me turn to the boiler and machinery coverage for a moment. This is a distinct endorsement in the policy that provides for coverage if an object breaks down as a result of an accident. And of course the policy has a completely circular definition of what constitutes an accident. An accident is something that's sudden and accidental. Well, it kind of leads us around in a strange circle. Washington courts under these boiler and machinery endorsements have interpreted the concept of sudden and accidental to mean unexpected and unintended from the standpoint of the named insured. That's the upshot of the Anderson and Middleton case that we cited to the court by way of additional authority. So from that standpoint, was this loss something that was unexpected from the standpoint of bioenergy of Washington? Absolutely. Was it something that was intended by bioenergy of Washington? Absolutely not. There's nothing in the record that documents any of that. The OCE report is specific in this regard in saying it was a sudden and unexpected loss. Excerpt of record 217, 219, 794, 796. The only contrary position that's offered by ACE here is they offer up their exclusion for wear and tear. There's no specific design defect exclusion for the boiler and machinery endorsement. And similar fact questions apply with respect to whether or not it was wear and tear or whether it was something that was absolutely sudden and unexpected from the standpoint of this named insured. The fact that OCE concluded that the loss was something that was occasioned by sudden and unexpected circumstances I think precludes the notion that the court, the district court could conclude as a matter of law that wear and tear precluded coverage under these circumstances. The upshot of the argument here, Your Honors, is this. This is a coverage case under Washington law with very clear cut principles of interpretation that favor insureds. This is a circumstance that abounds with questions of fact coming from different experts looking at these very complex issues. The trial court here jumped the gun in determining as a matter of law that there was no coverage under the general all risk provision in the policy or under the terms of the boiler and machinery endorsement in the case. And for these reasons we ask that the court reverse and allow the trier of fact or a jury to resolve these questions as it should. Thank you very much. Thank you, counsel. We'll hear from your opponent. Thank you, Your Honor, and may it please the court. I'm Anton Metlitsky with my colleague Kimya Syed for ACE. I wanted to discuss three issues, the two that my colleague discussed, the general insuring agreement and external cause, the boiler and machinery endorsement and also the late notice issue, which I think cuts across both issues and may be the most straightforward issue actually in the case. But since most of the discussion has been about the insuring agreement, I think it's useful to just go back and look at it. Before you get to any exclusions, ensuing loss or any of that, the first question under the insuring agreement is whether the damage was from an external cause, not an external source, as my colleague said. So the question isn't whether the but-for cause or one of the but-for causes comes from outside of the property, which I think is their argument. The question is whether it's an external legal cause. That term is well understood in the law and in particular the question, the way the facts present themselves here, several cases such as Port of Seattle in the Washington Court of Appeal and the GTE case in the Third Circuit, both of which dealt with Y2K type problems but also used analogies from physical property damage. Those cases stand for the proposition that when the property damage results from exposure to the very conditions to which the property is supposed to be exposed, that is not an external cause. The legal cause is some problem internal to the property. So for example, the two examples that the GTE cases use, one is a car whose tires blow out when it was driving 10 miles an hour. You can say that a but-for cause of the tires blowing out is the road, but the road is not a legal external cause. The cause is internal with some problem with the tires. The same, the other example that the court gave was a dam where the water rises to expected levels and the dam breaks. The problem is with the dam. Okay. But doesn't, I mean, again, I admit that I'm maybe trying to oversimplify things for my own benefit, but I just think of it as this. If this were some freak event that nobody could possibly have guarded against, prevented, designed for, tested, whatever, just literally the equivalent of an act of God, the set of circumstances that coalesced to make this thing fail, it seems to me that that should count as an external cause and there would be coverage. On the other hand, if it were, as you were just trying to describe, just some, like, no, this was the normal operation of this plant and for whatever reason, wear and tear, some defective part, that's what caused this thing to fail, then it seems to me there would be no coverage because you couldn't say that it was, external just as an awkward term, but that's how I would think of it. I think I basically agree with that, but the key is that what you're, the thing that has to be normal or expected or whatever is the conditions to which the property is exposed, not the way that the property reacts to those conditions, right? Here, their expert's position is gas came into the diffuser basket, it came into the vessel, it hit the diffuser basket, the gas that came in was, everybody agrees, coming in at normal operating parameters. Okay, but let me stop you there because if nothing different was going on in terms of how the thing was running, right, then it, I mean, why didn't this happen, you know, a year ago? It, presumably, at least as I understand their experts, it happened on this combination of circumstances that caused the, I don't know, the physics. No, to the contrary, Your Honor. I think, I think they're, I mean, we're only talking about their expert here because we're not, obviously, we're not trying to create an issue of material fact. Their expert's position is that gas came, the diffuser basket was exposed over, I think, between one and two years to continue, it was continuous exposure to incoming landfill gas. Everybody agrees that landfill gas was coming in normal, within normal operating parameters. What happened was, first, after a long time, the welding that held the plate, the bottom plate of the diffuser basket to the cylinder, came undone. I don't think their expert explains why that happened, but it happened. Then, the straps- I think their expert does explain why. I thought it was, it was like the, you know, sort of wine glass thing, right? The vibrations. Right. Right. As I understand their expert report, that may be, but I don't think that's right. I think the way I understand their expert- I understand you dispute that, but that's the problem. No, no, I'm not disputing it. I'm just trying to understand what their expert says. It doesn't, it doesn't matter for purposes of this. I thought what their expert said was that the welding broke, then the straps were the only thing holding the bottom plate on, and at that point, the straps started vibrating at a different frequency, and over a period of a year or two, after continuous vibration. It's not like, at the end of the day, of course, the break happened suddenly, but that's not the question. It was a year or two worth of break in the strap. That is, all of that is a problem with the internal to the basket, right? The gas is coming in just like it's supposed to come in. It's the basket that's, you know, resonating in the way they say it wasn't- It's gone back to the whole internal-external dichotomy when we've been sort of talking about, you know, a sort of modern approach to these analysis is looking at fortuitousness as a way of understanding what externality really means in the context of these policies. So I think I've talked about that concept enough, but I was just sort of calling you on the fact that I think you're using external cause one way, but a moment ago, you agreed with my colleague that it's not strictly, that it's got to be understood in the context of these types of policies as well, and it's pretty akin to the concept of fortuitousness. I don't think it's, I don't think it's fortuitousness because, you know, an all-risk policy covers all risks, and then you look at the exclusions. An all-risk policy that only covers external causes like this policy, again, only covers what the law understands to be external causes, which means a cause, or which doesn't mean, right, damage that results only from exposure to conditions to which the property was intended to be exposed. Now, there could be a fortuitous reason why the damage occurred. In that case, for example, I don't know, some kind of design defect or some other reason, but it's... Doesn't that mean that if you design a system to the best engineering specifications that you can, and you use it in a way that it was designed to be used, that any failure can never be ensured under these policies? No, no, not at all, because if the property is exposed to conditions other than conditions to which it was meant to be exposed, that would be an internal cause. I mean, you know, lightning, rock, storm, all sorts of things. Right, so the policy here is going to cover the lightning, the meteorite, the airplane falling on the pipe, but if you have the best science you can, and you design a pipe that every specification says is going to meet certain harmonic requirements, and everything's going to be fine, and you learn later, because these things are not hundreds and hundreds of thousands of these made, you learn later that there was some combination of, there was some reason that was unanticipated that it failed. That is not an insurable event. Under this policy, when... That's your position. When what's required... That's your position. So long as the failure was internal to the property, then yes, that's our position. Even unanticipated, no one could have done it. The best engineers in the world worked on it, everyone agreed it was to spec, and built appropriately. Something happened, the insured needs to... that's it. If all that happened was exposure to the conditions that the property was meant to be exposed to, then yes, I think as a matter of law, just like the Y2K cases, as a matter of law, there is not... Well, what about the harmonics issues? I mean, no one anticipated that it was going to be, at least the factual dispute, is being exposed to a particular frequency and duration of Right. The harmonics were a problem completely internal to the diffuser basket. That is not covered. It's also not covered under the boiler and machinery endorsement, if you take their experts' report as true, because the definition of accident... So a flaw is not going to be covered, even if there was no way to anticipate it, because now we can look back on it and say, well, it must have been defective. It just depends on what the... if the flaw is the kind of flaw that manifests based entirely on exposure to the conditions for... the expected conditions for which the property was made, then yes, it's not an external cause. I mean, again, that's the Y2K cases. That's the Volding case that the Port of Seattle case in Washington adopted. Well, counsel, let me ask you about the district court opinion. Sure. It seemed to me the district court contradicted itself by saying the V32 diffuser basket was not necessarily defective. Bennett went on to say, to conclude, that an inherent defect nonetheless existed. Now, combined with, in Jane Cole's expert opinion, that resonant vibrations caused the failure, and that was a rare event. Why isn't there a disputed issue of fact? I don't think there's... what the district court was saying is, I think, that the court didn't need to decide whether there was some kind of negligent design. That's what I think they were arguing in terms of when he said there's not necessarily a design defect. That doesn't matter. What matters is whether the legal cause was internal or external. And under their own expert's theory, the problem is with the basket, right? The problem is with the diffuser basket. Whether that's a negligent design or not. Well, the question is whether the vibrations were a rare event. You're evidently saying you could never insure for anything like that. You could insure for it. It's just that this insuring agreement distinguishes between internal causes, which are not covered, and external causes, which are. And again, just like Y2K problem and the other examples that cases like Port of Seattle and the GT case in the Third Circuit put forth, the question in a case like this is whether the property damage occurred because of exposure to expected conditions, the conditions that it was meant to be exposed to. If that's the only thing from which the damage resulted, then that is not an external cause. I don't think I have the facts on this straight. I thought their expert was saying that the failure of this basket on the particular day was on the order of a catastrophic thing. It wasn't just a wear and tear over a year's time, but it was something happened, I don't know if it was on that particular day, but a very short time period. Yeah, go ahead. They're relying on that statement. That's true. But what the statement is, is that when the break happened, it was sudden, right? That's short. When the break happened, it was sudden. That's like if an axle over years is subject to wear and tear on a car, when the wheels eventually pop off, that is sudden. That's not what matters because the definition of accident doesn't include wear and tear. I agree, but you can help me with this. I didn't understand their expert's opinion to say that, yeah, the failure was sudden, as it always is, as you just said, but what caused that actually was exposure to a particular frequency or vibration over a period of a year. Their expert says it happened over one to two years, continuous exposure to incoming landfill gas that caused vibrations that weakened the materials and eventually, their expert says suddenly broke, but that last thing is irrelevant as a matter of law if what caused it to break, the process that led up to causing it to break was just the continued repeated exposure to normal conditions, right, that ended up causing vibrations and then a sudden break, right? That is wear and tear, but I also wanted to discuss the notice issue because obviously, that's an issue that cuts across both coverage questions. I think there's very little dispute here that there was a reportable loss on October 1st, 2010. There was nothing to report on that date. Well, October 5th is when they... There was nothing to report then. Oh, no, I think there was. The basket failed, the problem taken care of, that's what they thought. There was nothing to tell you all about because they didn't want you to replace the basket. The basket failed and 32,000 pounds of media were destroyed. Yeah, but they didn't have to pay for the replacement, so there was no loss. There was nothing for them to come to you and say, hey, we need you to pay for this. It wasn't until the whole system crashed months later. That's when they said, now we need our insurer to accept it. The loss provision doesn't require the insurer to provide notice when they're asking for payment. It requires notice for every loss here under, which means property damage, right? And so the question is when... We're going to notify you that we don't want you to pay for something. That makes no sense. Obviously, they're going to come to you when they say, we've suffered a loss, we're out of pocket, a bunch of money, and we think you have to pay us for that. If they're not out of pocket anything, there's nothing to report to you all. Well, first of all, they were out of pocket starting on October 1st. If you look at their initial disclosures, they are asking for damages starting on October 1st. Second of all, if you look at the actual notice letter that they sent in May, the first line is the date of the loss, October 2010, right? If you look at their complaint, they say, for example, paragraph 75, which is ER-564, they say all the loss all resulted from a single occurrence, namely the accident to vessel V-32 on or about October 1st, 2010. Again, in their complaint at paragraph 57, they say they're asking for Ace to pay for the Cedar Hills incident of October 1st, 2010, which continued thereafter and led to a second shutdown and further losses. There might be, for example, a defense of a good faith belief in non-coverage if they thought, for example, that the loss wouldn't clear the policy's, you know, deductible amount of $50,000. Sure. They don't argue anything like that, obviously. All they're saying is that there was a loss. It was a covered loss under their view at the time. They knew it was a covered loss because the cost of just the shutdown of the plant was well above $50,000. But we just didn't want to tell our insurer. We made a mistake. We realized that the loss that we knew, should have known, was covered at the time was much bigger. We found that out in March. And so now we're going to give notice 200 days after what the notice letter itself says was the date of the loss. There is no case, and they don't cite a single case, that allows for a defense to notice when the only reason you didn't give notice was you knew that there was a loss of a size that would have been covered under the policy, but you just didn't know how big it was going to be. Let's assume, though, that Washington law applies. What's your response to the fact that it turned out your expert says he or she, I don't remember, was able to basically do whatever needed to be done based on photographs? That is not what our expert says. The question was, you know, you saw these photographs. Are the photographs sufficient to support your opinion? Well, of course, they're sufficient to support the opinion, because the opinion is, I have recreated this accident through software, right? And my opinion is that this is how it happened. But that's only because these are the only photographs were the only thing he had. No expert would say, yeah, you know, I don't need to actually, I would rather, or it's irrelevant to me whether I have the actual damaged property so that I could actually examine it. I think it was your, wasn't it your client's burden to show prejudice under Washington law? Yeah, and we. That's what I was wanting to get you to get to. So what was the prejudice given that your expert was. The prejudice is that the damaged property was disposed of right after the accident on when they found out about it on October 5th, which means that we could not examine it, actually look at the metal and see what caused the loss. Both experts now are trying to recreate this accident in a vacuum based on the best information they had. But, you know, for example, the Keytronic case out of Washington makes clear that if the insurer doesn't actually, isn't able to examine the property to see what happened, that is prejudice. They cite cases where just the passage of time, you know, doesn't count as prejudice under Washington law. And we don't argue otherwise, but the passage of time is not the problem here. The problem here is that if they had told us at the outset, we could have been inspected and seen what happened to the actual property. Now I want to fight back on the proposition that Washington law applies because I think everybody agrees here that section 188 of the restatement applies. And just taking a step back, the 188 of the restatement is about the most significant relationship of the state to the contract, which means that at least on an issue per issue basis, the same state's law is going to apply no matter where the actual, you know, property damage happened. Which means under their theory, if one of the Virginia plants broke and the issue or, you know, there was damage to the Virginia plant and the issue was late notice, Washington law would apply. That seems to me to be highly counterintuitive at the least. And the reason it seems so strange is because all of the section 188 factors are, you know, point, it seems to me, to Virginia unambiguously. You know, the contracting took place, the contract was negotiated, if not completely in Virginia, at least predominantly in Virginia. Even the addition of this plant, which isn't the, you know, the relevant point because it's about the contract as a whole, was first discussed by the parties at a meeting in Virginia and Ingenco's risk manager delegated the negotiating of that addition to Ingenco's Virginia agent. You know, when they discussed renewing the contract in 2010, when Cedar Hills had already been added, it seems to me significant that they discussed that completely in Virginia and toward Virginia plants. If they viewed this as a Washington contract, it seems to me that somebody would have at least thought about looking at the Washington plant, but nobody did. And of course, Ingenco, which is the only party to the contract from their side as a Virginia company, they say BEW operates in Washington, but BEW under their own pleadings is a Virginia company. It's an LLC with one member who's also at home in Virginia. So this is a completely a Virginia contract. And it seems to me under 188, Virginia law should apply. You never get to the prejudice, but there's prejudice in any event. Okay. All right. Thank you, counsel. You have about four, a little over four minutes left for rebuttal. Thank you, Your Honor. Let me touch upon the choice of law issue and the question of actual substantial prejudice under Washington law. First, the district court applied choice of law principles appropriately. It applied 188 of the restatement. Although the court did not explicitly call out section six, which is an overlay to 188 of the restatement of choice of law, the court applied public policy factors in its decision and excerpts of record 185 as it should. This facility is vitally important. It's ironic that if you look back in Washington case law, the Queen City Farms cases cited at the court, for example, we're still talking about the Cedar Hills facility. This is a facility that has been at issue for a long, long time in terms of Washington, the hazard to Washington in terms of its environmental impact. And this renewable natural gas facility is vitally important. As a condition of the contract between King County and Bioenergy of Washington, there was a requirement that insurance be provided. So this insurance issue is vitally important. Renewable natural gas is a vital aspect of Washington public policy, and it was one of the reasons the court put its thumb, so to speak, on the scale in favor of applying Washington law here. You had, I think, also some circumstances involving the negotiation of the contract. There was never a contact about this particular coverage for this Washington site because there was a history that was discussed in the declaration of Mr. Yearley and also in Mr. Drag's declaration as well. This is SCR 122 to 126 and 168 to 170. The parties initially had builders all risk policy based on this facility. They decided to add this facility to the master in GENCO policy as a matter of cost. But the bottom line was there were no particular meetings in Virginia about Cedar Hills. It was always understood and expected by the parties that Washington law would apply. And the Washington facility was being covered. In terms of Washington law, Judge Watford, your question about actual substantial prejudice is right on. I had the case of Lloyd's of London in the Port of Longview case. In that case, it's a question of fact invariably under Washington law about whether there's actual and substantial prejudice to the insurer. We disagree that there was an untimely reporting of notice here, but regardless of that, it's a question of fact for the trier of fact on actual substantial notice. In that case, 19 years elapsed without notice being given. The witnesses died. The Port of Longview's key witnesses involving the pollution that was occurring on port property died. And the port reconfigured the property, reconfigured the physical configuration of the property where the pollution was occurring. You would think that that would constitute prejudice to the insurer as a matter of law under Washington law? No. Question of fact. Court of Appeals determined that. Review denied by the Washington Supreme Court telling you how powerful the principle is that actual substantial prejudice is a question of fact under Washington law. With respect to the questions that the counsel argued, it really comes down to the question I think you raised, Judge Pregerson, here. If you understood as an average purchaser of insurance in interpreting external cause as an ordinary popular or regular meaning of that term would come to be understood. Your Honor, can I just suggest this? Is this a matter that should be referred to the Washington Supreme Court? Because it seems like there's a lot of back and forth about what external cause means. There's certainly evolving trends in other circuits about the interrelatedness between the sort of logical concept of fortuitousness and whether external cause really means something external or something very narrow as the carrier has suggested. Isn't this one of these things, cases where we ought to say, hey, you know, let's see what the Washington Supreme Court has to say because it's an important issue and we're struggling with the definition. You could do that. It's certainly within your discretion to do that. We don't think you need to do it. If there's any ambiguity in the term external clause, you construe the term against the insurer under Washington law. You could have the Washington Supreme Court say that certainly, but external cause, I think it's a well-understood principle. And let me leave you with this notion. Utterly unexpected, this set of circumstances. You had the Cassray testimony at ER 391. You had Ritter's testimony at 354, 359. And I would note that there were dozens of these baskets that were sold by Guild, 60 at least, that performed without incident. This was an utterly unexpected set of circumstances. And that was the genesis of the report of the R expert OCE at ER 857. It was sudden. It was unforeseeable. It was not something the designers could foresee. All of these are questions of fact for the trier of fact, and we believe the trial court should be reversed under the circumstances. Thank you. Okay. Thank you very much, counsel. The case just argued will be submitted.
judges: D.W. Nelson, Watford, Pregerson